**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

SHANNA HALALILO,

      Plaintiff,

vs.                                                                                     Case No.

NEW MEXICO HIGHLANDS UNIVERSITY and
BOARD OF REGENTS OF NEW MEXICO
HIGHLANDS UNIVERSITY (A/K/A THE
BOARD OF REGENTS OF NEW MEXICO
NORMAL UNIVERSITY),

      Defendants.

COMPLAINT FOR VIOLATIONS OF TITLE IX OF THE EDUCATION
AMENDMENTS OF 1972, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
NEW MEXICO HUMAN RIGHTS ACT, FAIR PAY FOR WOMEN ACT, AND
WHISTLEBLOWER PROTECTION ACT

Plaintiff Shanna Halalilo ("Ms. Halalilo"), through counsel, Trent A. Howell, brings this

Complaint against New Mexico Highlands University ("NMHU") and Board of Regents of

NMHU (a/k/a the Board of Regents of New Mexico Normal University) ("Regents").

SUMMARY OF CLAIMS, JURISDICTION, AND VENUE

1.      This is an "intersectional discrimination" case brought within the Court's federal

question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. §

1367 for redress of Defendants' violations of Title IX of the Education Amendments of 1972

(Title IX), 20 U.S.C. § 1681 to 1688, Title VII of the Civil Rights Act of 1964 (Title VII), 42

U.S.C. §§ 2000e to 2000e-17, New Mexico Human Rights Act (HRA), §§ 28-1-1 to 28-1-14,

Fair Pay for Women Act (FPWA), §§ 28-23-1 to 28-23-6, and New Mexico Whistleblower

Protection Act (WPA), NMSA §§ 10-16C-1 to 10-16C-6.

2.      Defendants' violations arise from a common nucleus of operative facts, in which

they—on the basis of race, religion, and sex—knowingly, willfully, and without good-faith basis or belief of legality harassed, discriminated against, and terminated Plaintiff (a Polynesian Non-Latter Day Saints (LDS) Female) from employment effective May 4, 2025, and over the same periods retaliated against Plaintiff for opposing the acts directed at herself as well for advocating for more appropriate Title IX policies and practices with respect to sexual relationships between Staff and Student-Athletes at NMHU as a governmental entity and recipient of federal funds.

3.      Plaintiff Halalilo is a resident of Santa Fe, New Mexico.

4.      Defendant NMHU is a state post-secondary educational institution in Las Vegas, New Mexico, originally named New Mexico Normal University, *see* NMSA § 21-3-1, and also later known for common convenience as New Mexico Highlands University.  NMSA § 21-3-2.

5.      By statutory mandate, NMHU "shall be forever strictly nonsectarian in its character and management, and no creed or system of religion shall be taught, practiced or exercised in it."  NMSA § 21-3-10.

6.      Defendant Board of Regents of NMHU controls and manages NMHU, is a body politic and corporate, has power to be sued for NMHU operations, and is vested with title to all property belonging to NMHU.  *See* NMSA § 21-3-4.

7.      Venue is appropriate because the actions complained of are conduct and employment practices of Defendants, who operate and employed Plaintiff within the District of New Mexico, subject to the employment laws of the State of New Mexico.  28 U.S.C. § 1391. And such actions subject Defendants to the personal jurisdiction of the District of New Mexico as to this civil action.  *Id*.

8.      The facts above and herein make this action timely, confer jurisdiction over the parties and subject matter hereto in the District of New Mexico, and make this District a proper

venue in which Plaintiff may file this lawsuit.

BACKGROUND FACTS

9.    Ms. Halalilo faithfully served NMHU for seven years, working her way up to Athletics Director ("AD") (January – May 2025) and Co-AD (March 2023 – January 2025) from Associate AD for External Operations (February 2022 – March 2023), Student-Athlete Success Coordinator (October 2018 – February 2022), and Assistant Women's Basketball Coach (July 2018 – October 2018).

10.    Before his departure from NMHU, Past President Sam Minner ("Minner") (White Non-LDS Male) had tracked Ms. Halalilo to rise to AD, making her Co-AD in March 2023.

11.    Minner also warned Ms. Halalilo that Regent "Harpo" Sanchez ("Sanchez") (White-Hispanic Male) was against having a woman AD.

12.    Minner then left NMHU on or about June 30, 2024.

13.    On December 12, 2024, Sanchez engaged in offensive sexual conduct and remarks toward Ms. Halalilo, which she reported on December 20, 2024, to new President Neil Woolf ("Woolf") (White LDS Male) and Compliance/Title IX Director Ruth Mariampolski ("Mariampolski") (White Female).

14.    Both Woolf and Mariampolski laughed off Ms. Halalilo's report, suggesting Sanchez's sexism is just part of NMHU culture.

15.    Sanchez became Regents Chair on March 19, 2025.

16.    The same day, Ms. Halalilo had to ward off and decline sexual advances by Paul Grindstaff, NMHU Advancement Vice President (White LDS Male).

17.    Within weeks after these events, on May 4, 2025, Woolf fired Ms. Halalilo for vague reasons (saying "things" were "weird" and "the group" lost "respect" for her).

18.     **Woolf, a White LDS Male, made the decision to terminate Ms. Halalilo (a Non-White Non-LDS Female) after conferring with Grindstaff (White LDS Male) and Football Coach Kurt Taufa'asau ("Taufa'asau") (an LDS Male).**

19.     **Woolf also then approached two White LDS Males—Grindstaff and Zach Settembre ("Settembre")—and a White LDS Female (Amanda Evans) to replace Ms. Halalilo, before hiring Scott Noble (White Male).**

20.     Upon information and belief, only on May 6, 2026—a full year after it let Woolf and Grindstaff subject Ms. Halalilo to a discriminatory termination—did NMHU finally place both Woolf and Grindstaff on leave for still other acts by which they attempted to use the public, taxpayer funds of NMHU—a state, non-sectarian educational institution—to favor and promote LDS interests and members.

21.     Prior to its May 4, 2025 termination of Ms. Halalilo, NMHU had also subjected her to earlier discrimination and retaliation in terms and conditions of employment.

22.     From February 2023 through May 2025, Ms. Halalilo suffered sexual/sexist remarks, treatment, and harassment by other NMHU Officers, Coaches, Staff, former Staff, and Boosters.

23.     Ms. Halalilo also reported much of this to Human Resources ("HR") Director Victoria Lovato ("Lovato") and to Mariampolski.

24.     Lovato and Mariampolski gave mild/delayed responses to Ms. Halalilo's initial reports, leaving her in a prolonged hostile environment, eroding her health and performance.

25.     These and earlier actions and inactions of Woolf, Mariampolski, and Lovato demonstrated NMHU had embraced a culture of non-compliance, revealed its supposed anti-discrimination and anti-harassment policies, procedures, and "preventive and corrective

opportunities" were, in fact, inoperative, and thus deterred and discouraged Ms. Halalilo from making further reports, as they appeared futile.

26.    NMHU similarly discouraged not only Ms. Halalilo, but also women in general in the NMHU community, from making complaints against men, because NMHU would investigate those complaints only slowly and forgivingly.

27.    Similar to its leniency with Sanchez, NMHU kept Ms. Halalilo's ex-husband, Mike Dominguez ("Dominguez"), as Basketball Coach through a year that he harassed and threatened Ms. Halalilo at work.

28.    Despite Ms. Halalilo complaining of these matters, NMHU minimized her complaints—even after she got a temporary restraining order against Dominguez in July 2024.

29.    Only when Woolf grew disappointed with Dominguez's on-court performance with the basketball team, did NMHU finally terminate him in March 2025.

30.    Similarly, in April 2025, Ms. Halalilo suspended a male Football Student-Athlete who threatened a Housing Director and female Assistant Housing Director.

31.    Taufa'asau fought suspension of the male Student-Athlete, even though the male Student-Athlete's conduct was documented, admitted, and violent.

32.    After and because of Ms. Halalilo suspending the male Student-Athlete, Taufa'asau held a grudge and retaliated against Ms. Halalilo, including through his referenced role in discussing and reaching the decision for Woolf/NMHU to terminate her employment.

33.    When complaints were against women, NMHU reacted quickly and harshly.

34.    For example, Taufa'asau reported that Ms. Halalilo was dating Assistant Football Coach Ben Langford ("Langford").  HR and President Woolf addressed this complaint with Ms. Halalilo within days of Taufa'asau's initial report.  Both Lovato and Woolf assured Ms. Halalilo

she did not violate any policy. But they said she needed to disclose this personal information. And both Woolf's and NMHU's rapid response remained puzzling and inconsistent with how it addressed complaints by women against men.

35.    To clarify, NMHU has no policy against any employees dating. There are known cases of male employees who supervise—or whose positions would supervise—women with whom they have romantic relationships. While Minner was President, Ms. Halalilo was also Co-AD for months when Dominguez and she were still married and he was still Basketball Coach—a direct-line report to the AD. Back then, Mariampolski told Ms. Halalilo there had even been prior instances of NMHU getting notice of and needing to apply no-contact orders between such employees. But under Woolf, Taufa'asau got immediate follow-up for reporting that Ms. Halalilo was dating Langford, although (1) Langford was a less-direct report to Ms. Halalilo than Dominguez had been; (2) Ms. Halalilo had no role in hiring or any employment action for or against Langford; (3) Langford never complained; and (4) even any potential conflict was later eliminated (with Langford resigning). In allowing Taufa'asau to campaign against Ms. Halalilo in that way, NMHU exhibited a pattern of discriminating in how it evaluates and disciplines men versus women. And it let Male LDS employees (Taufa'asau) harass, stalk, and rumor-monger Ms. Halalilo around the issue without them suffering any discipline.

36.    Weeks before her termination, in March 2025, Ms. Halalilo also denied a raise to Women's Basketball Coach Lindsey Fearing ("Fearing") for failing to adhere to Anti-Fraternization reporting protocols. Ms. Halalilo did so in part based on Fearing's staff (a Graduate Assistant) having romantic relationships with Student-Athletes they coached. This was an issue Ms. Halalilo reported as to other coaches in 2021, 2023, and 2024. This was also an issue both Mariampolski and Lovato admitted "happens all the time." And Ms. Halalilo had

written and advocated for better Title IX and Anti-Fraternization Policies to address these issues, finally getting them adopted in September 2024.

37.    NMHU had actual knowledge of each of Ms. Halalilo's above "opposition" reports, complaint, or objections, because she voiced them directly to the highest-ranking persons NMHU designated to receive, address, and resolve such matters—including President Wolf, Compliance/Title IX Director Mariampolski, and HR Director Lovato.

38.    Similarly, by their literal laughter, inaction, and retaliation in response to these reports, the highest designated officers of NMHU on these matters exhibited intentional discrimination and retaliation, malice, and reckless indifference to her federally protected rights.

39.    The timing among all these events suggests NMHU retaliated and allowed retaliation against Ms. Halalilo for her reports and efforts to oppose non-compliance.  It allowed persons (including but not limited to Sanchez, Grindstaff, Fearing, and Taufa'asau) with retaliatory motives and intent to make complaints or to join in and/or influence decisions of adverse actions against Ms. Halalilo, despite knowing or failing reasonably to investigate, discover, and factor in such persons' retaliatory motives.  And every significant NMHU decisionmaker since Minner appeared to discount Ms. Halalilo's voice, issues, and ability based on her gender and the diminished roles persons of their Religion (Woolf, Grindstaff, and Taufa'asau all being LDS) and Race (White, in the case of Woolf and Grindstaff, and Polynesian, in the case of Taufa'asau) have historically assigned to women of color.

40.    Finally, part of the essential functions of Ms. Halalilo's position was to oversee and to ensure Defendants' compliance with federal and state law regarding interactions between NMHU coaching staff and NMHU student-athletes.

41.    Thus, an atmosphere allowing Mr. Halalilo to speak up without fear of reprisal on

7

Title IX, Title VII, and HRA rights was essential both to her own job performance and to NMHU's compliance with those laws.

42.    In discharge of her essential job functions, but further in the public interest and for the protection of Student-Athletes against power imbalances with Coaches, as noted above, Ms. Halalilo spoke up and pushed for policy changes within NMHU on issues including sexual harassment, sexist pay differences, and the question of romantic relationships between Coaches and Student-Athletes.

43.    According to her public LinkedIn profile, Ms. Mariampolski received a law degree in 2009; was for a combined 10 years a private lawyer, then government lawyer and hearing officer in the area of employment law, including EEO and ADA; and since March 2020 has had the following duties on behalf of NMHU:

   a.    *Intake and investigation of complaints alleging discrimination*, including complaints *under* Title VII, *the ADA*, and Title IX.

   b.    For non-Title IX matters, *conduct investigations and write determinations which inform the President of the University of investigation findings and recommend a resolution*.

   c.    For Title IX matters, serve as Title IX Coordinator and Title IX Investigator.

   d.    Policy development relating to Title IX procedures under the 2020 Title IX Final Rule.

   e.    Creation and implementation of training programs related to Title IX and other *antidiscrimination law, applicable to students, faculty, staff, and administration*.

   f.    *Provide* research and *expertise to Human Resources on employment law issues*.

*See* attached Exhibit A (Ruth Mariampolski LinkedIn Profile) (emphasis added).

44.    Given Ms. Mariampolski's education, experience, "expertise," and NMHU duties and authority, her literal "scoffing" at the law on these matters is imputable to NMHU as specific

8

proof of an institutional intent by NMHU to engage in discrimination. *See* Fed. R. Evid. 801(d)(2) (allowing use of statement against opposing part if: "(C) … made by a person whom the party authorized to make a statement on the subject; or (D) … made by the party's agent or employee on a matter within the scope of that relationship and while it existed").

45.     By general agency law, awareness of such facts by Ms. Mariampolski, within the course and scope of her job as Compliance Director, is imputed to the principal, NMHU. Under New Mexico law, "Since a corporation can act only through its officers, agents and employees, it is necessarily chargeable with the composite knowledge of its officers and agents acting within the scope of their authority." *Sawyer v. Mid-Continent Petroleum Corp.*, 236 F.2d 518, 520 (10th Cir. 1958) (applying New Mexico law) (citing 19 C.J.S., Corporations, § 1081, p. 618); *Trinity Universal Ins. Co. v. Rocky Mountain Wholesale Co.*, 353 F.2d 574, 577 (10th Cir. 1965) (applying New Mexico law); Restatement (Second), Agency, § 275. Similarly, under NMHRA, a manager's knowledge of an illegal employment practice imputes to the corporation. *See Ocana v. American Furniture Co.*, 2004-NMSC-018, ¶ 34, 135 N.M. 539, 551-52. In *Ocana*, the New Mexico Supreme Court held that in evaluating who is authorized to receive binding notice of an NMHRA illegal employment practice for a corporation, the question is whether the individual has managerial authority or was part of the corporation's management. *Id*.

46.     Imputing Ms. Mariampolski's knowledge and reactions to NMHU is especially appropriate, since Ms. Mariampolski's self-described duties include not only investigating discrimination, but also making determinations on such investigations, informing the NMHU President of her findings, and recommending corrective action or "resolution." Ex. A.

47.     Imputing Ms. Mariampolski's knowledge and reactions to NMHU is also apt with respect to issues of Defendants' Title IX, Title VII, HRA, FPWA, WPA, and punitive-damage

liability, because the Tenth Circuit holds scienter of senior controlling officers of a corporation may be attributed to the corporation itself to establish liability when those senior officials were acting within the scope of their apparent authority. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-07 (10th Cir. 2003) (citing *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001) (holding that the scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934); *Cromer Finance Ltd. v. Berger*, Nos. 00 Civ. 2284(DLC) & 00 Civ. 2498(DLC), 2002 WL 826847, at *7-8 (S.D.N.Y. May 2, 2002) (holding that scienter of partner of accounting firm could be imputed to the firm itself under traditional agency principles); *In re JDN Realty Corp. Sec. Litig.*, 182 F.Supp.2d 1230, 1246 (N.D.Ga. 2002) (holding that scienter of chief executive officer of defendant corporation was attributable to the corporation); 2 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 12.8[4], at 444 (4th ed. 2002) ("[K]nowledge of a corporate officer or agent acting within the scope of authority is attributable to the corporation.")

48.     In turn, Ms. Halalilo alleges Defendants willfully, maliciously, and recklessly:

a.     aided, abetted, compelled or coerced the commission of unlawful discriminatory practice based on race, religion, and sex;

b.     engaged in threats and reprisals against her for her opposition of unlawful discriminatory practice based on sex (on behalf of others and on behalf of herself);

c.     willfully obstructed and prevented her and others from complying with provisions of the Title IX, Title VII, HRA, FPWA, and other state and federal laws;

d.     retaliated against her by taking adverse employment actions against her; and

e.     engaged in a pervasive pattern of harassment against her that fostered a hostile work environment.

49.     Ms. Halalilo further asserts Defendants did the foregoing in willful, malicious,

and reckless violation of Title IX, Title VII, HRA, FPWA, and WPA.

50.    Plaintiff received no protection or intervention and instead suffered escalating retaliation after she:

      a.    notified NMHU—through its in-house attorney/Compliance/Title IX Coordinator, Ruth Mariampolski ("Mariampolski")—of "discrimination on the basis of sex" under Title IX, 20 U.S.C. § 1681;

      b.    notified NMHU of "conduct that reasonably may constitute sex discrimination under Title IX" within the meaning of 31 CFR § 106.44 (f)(1);

      c.    opposed unlawful practices and assisted and participated in an investigation under Title VII, 42 U.S.C. § 2000e-3(a);

      d.    opposed unlawful practices under HRA, NMSA § 28-1-7(i)(2);

      e.    engaged in "asserting a claim or right pursuant to [FPWA] or assisting another person to do so, or for informing another person about employment rights or other rights provided by law" under FPWA, NMSA § 28-23-2(d); and

      f.    "communicate[d] to," "provide[d] information to," and "object[ed] to" NMHU regarding actions, failures to act, and activities, policies, and practices that Halalilo believed in good faith to constitute unlawful or improper acts under WPA, NMSA § 10-16C-3(a), (b), and (c), and thus engaged in protected activity while making good-faith protests, lawfully defending herself, and invoking clear, legal rights, against Defendants' acts of discrimination and retaliation.

51.    Such oppositional activities "include the many ways in which an individual may communicate explicitly or implicitly opposition to perceived employment discrimination." EEOC Enforcement Guidance on Retaliation and Related Issues. No. 915.004 (August 25, 2016)

11

at 4.  https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm.

52.    By their actions and communications set forth below, including harassing, discriminating against, and terminating Halalilo, Defendants as a direct result of Ms. Halalilo's protected classes and complaints engaged in:

    a.    "discrimination" and "retaliation" under Title IX, 20 U.S.C. § 1681, *see Jackson v. Birmingham Bd. of Ed.*, 544 US 167 (2005);

    b.    "discrimination" and retaliation under Title VII, 42 U.S.C. § 2000e-3(a);

    c.    "discrimination" under HRA, NMSA § 28-1-7(a);

    d.    "aiding," "abetting," "inciting," "compelling," "threats," "reprisal," and "discrimination" under HRA, NMSA § 28-1-7(i)(1), (2), and (3);

    e.    "discrimination" under FPWA, NMSA § 28-23-3;

    f.    "discharge," "demotion," discrimination "in the terms or conditions of employment," and "retaliation" under FPWA, NMSA § 28-23-5; and

    g.    "retaliatory action" under WPA, NMSA § 10-16C-3, including but not limited to multiple "discriminatory or adverse employment actions … in the terms and conditions of public employment" under WPA, NMSA § 10-16C-2(d).

53.    For purposes of all these statutes and the separate causes of action enumerated herein, Ms. Halalilo was and is well "qualified" for both the Co-AD and AD positions, as she met the requirements for both positions and can and did perform the essential functions of these positions, having been selected for and employed by Defendants within them for over a year.

ADDITIONAL JURISDICTIONAL FACTS

54.    NMHU is a state educational institution and agency, created by Constitution and statute.  *See* N.M. Const., art. XII, § 11, as repealed and reenacted on November 8, 1960

12

(changing the name of New Mexico Normal University to New Mexico Highlands University); 21-3-2 NMSA 1978.

55.     Defendant NMHU at all relevant times was an agency and arm of the State of New Mexico and can be sued pursuant to § 10-16C-4 NMSA 1978.

56.     The unlawful employment and whistleblower retaliation against Ms. Halalilo alleged herein were committed by Defendants on dates from 2023 through May 4, 2025 in the State of New Mexico, thereby making this action timely, and conferring jurisdiction over the parties and subject matter hereto in this Court.

57.     The statutory claims asserted herein under HRA, FPWA, and WPA are not subject to the New Mexico Tort Claims Act ("NMTCA"), which was enacted in 1976.

58.     Amended several times since 1976, by a legislature fully aware of the existence of NMTCA, HRA is an express legislative waiver of the partial immunity otherwise created by the NMTCA.

59.     HRA defines its covered employers to include "any person employing four or more persons and any person acting for an employer" and defines "person" to include "the state and all of its political subdivisions." *See* §28-1-2 (A) and (B) NMSA 1978.

60.     In addition, while setting forth the process by which an aggrieved person may appeal any administrative determination to the district court, HRA dictates "the state shall be liable the same as a private person." *See* §28-1-13 (D) NMSA 1978.

61.     Enacted in 2013, by a legislature fully aware of the existence of NMTCA, FPWA is an express legislative waiver of the partial immunity otherwise created by the NMTCA.

62.     FPWA defines its covered "employers" more generally, yet still in a way the New Mexico Court of Appeals has held includes state and public employers. *See Wolinsky v. N.M.*

*Corrections Dep't*, 2018-NMCA-071, 429 P.3d 991 *cert. denied.*

63.    Finally, enacted in 2010, by a legislature fully aware of the existence of NMTCA, WPA is an express legislative waiver of the partial immunity otherwise created by the NMTCA.

64.    WPA not only defines its covered employers to include public employers; the entire statute is expressly limited to public employers.  *See* § 10-16C-2 (C) NMSA 1978.  That is, the entire purpose and effect of WPA is to create specific liability of public employers in waiver of prior NMTCA immunity.

65.    Pursuant to the New Mexico Supreme Court decision in *Luboyeski v. Hill*, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994), NMTCA does not supersede or override WPA.

66.    Nevertheless, pursuant to § 4-46-1 (A) NMSA 1978, Defendants had both "actual notice" and "written notice" of the occurrence giving rise to this Complaint within less than 90 days of said occurrences.

67.    Ms. Halalilo has satisfied all preconditions that would otherwise apply to sue under the NTCA, § 4-46-1 (A) NMSA 1978.

68.    In compliance with Title VII, HRA, and as optional under FPWA, Ms. Halalilo on January 27, 2026 initiated with NMHRB and EEOC timely Charges of Discrimination, pursuant to NMSA § 28-1-10(A); and prior to the expiration of 90 days from the date of service of EEOC's and HRB's orders/notice of rights to sue, filed this Complaint/Notice of Appeal in the federal district court where the discriminatory practices occurred and where Defendants do business, pursuant to NMSA § 28-1-13(A).

69.    Pursuant to the WPA, NMSA §10-16C-6, Ms. Halalilo timely filed this Complaint prior to the expiration of two years from the date on which the retaliatory actions occurred.

70.    Because the operative facts of Ms. Halalilo's Title IX and Title VII claims so

closely relate to those of her HRA, FPWA, and WPA claims, the court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. § 1367, HRA, NMSA § 28-1-13(A), and WPA, §10-16C-4 NMSA 1978.

CAUSES OF ACTION

COUNT I
TITLE IX DISCRIMINATION/RETALIATION

71.    Plaintiff realleges the preceding allegations as though fully herein repeated.

72.    Title IX's prohibition on discrimination is enforceable through an implied cause of action. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688-89 (1979).

73.    Sexual harassment is an actionable form of discrimination under Title IX. *See Franklin v. Gwinnett County Pub. Schools*, 503 U.S. 60, 75 (1992).

74.    Both damages and injunctive relief are available in private suits under Title IX. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009).

75.    Title IX's "broad directive that 'no person' may be discriminated against on the basis of gender appears, on its face, to include employees as well as students." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 520 (1982).

76.    An employee's retaliation claim may proceed under *Cannon's* allowance of an implied cause of action. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005).

77.    Courts, including the Tenth Circuit, generally assess Title IX discrimination claims under the same legal analysis as Title VII claims. *Throupe v. University of Denver*, 988 F. 3d 1243, 1251 (10th Cir. 2021).

78.    Plaintiff is a "person" under Title IX, 20 U.S.C. § 1681.

79.    Plaintiff is a member of a "protected class," "sex" (Female), under Title IX, 20

U.S.C. § 1681.

80.    Plaintiff is also a member of a "protected class" by virtue of making complaints, reports, and objections to discrimination on the basis of "sex," whereby Plaintiff engaged in protected 'opposition' under Title IX, 20 U.S.C. § 1681, and 31 CFR § 106.44 (f)(1).

81.    Defendants are an "education program or activity receiving Federal financial assistance" under Title IX, 20 U.S.C. § 1681.

82.    By her above actions and communications, Plaintiff notified NMHU—through its in-house lawyer/Compliance/Title IX Coordinator, Mariampolski—of "discrimination on the basis of sex" under Title IX, 20 U.S.C. § 1681.

83.    By her above actions and communications, Plaintiff notified NMHU—through its in-house lawyer/Compliance/Title IX Coordinator, Mariampolski—of "conduct that reasonably may constitute sex discrimination under Title IX" within the meaning of 31 CFR § 106.44 (f)(1).

84.    By law, in response to such reports, Mariampolski was responsible to coordinate NMHU's compliance with Title IX and to, among other measures:

    a.    "take actions to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects," 31 CFR § 106.44 (f)(1);

    b.    "treat the complainant and respondent equitably," 31 CFR § 106.44 (f)(1)(i);

    c.    "offer and coordinate supportive measures," 31 CFR § 106.44 (f)(1)(ii), including "restrictions on contact applied to one or more parties," 31 CFR § 106.44 (g)(1); and

    d.    "[r]egardless of whether a complaint is initiated, take other appropriate prompt and effective steps … to ensure that sex discrimination does not continue or recur within the recipient's education program or activity," 31 CFR § 106.44 (f)(1)(vii).

85.    NMHU, by and through its designated in-house lawyer/Compliance/Title IX Coordinator, Mariampolski, willfully disregarded these obligations, provided Ms. Halalilo no

16

support or protection, and instead allowed and/or caused her to suffer a discriminatory and retaliatory termination within just weeks of her protected complaints.

86. NMHU, by and through the persons who made, ratified, and were required or should have been required to influence and authorize the termination—including but not limited to Woolf, Mariampolski, and Lovato—had actual knowledge of Ms. Halalilo's prior complaints and advocacy under Title IX.

87. Ms. Halalilo suffered tangible, adverse employment actions, including but not limited to that Defendants terminated the employment of Ms. Halalilo on May 4, 2025.

88. Mr. Halalilo's protected Title IX complaints and advocacy were a but-for cause of NMHU's adverse actions.

89. This direct causal connection is shown by the close timing (including but not limited to the May 4, 2025 termination decision coming just weeks after Ms. Halalilo's March and April 2025 Title IX complaints and advocacy), as well as the fact that the NMHU officers (Woolf, Mariampolski, and Lovato) who were or should have been involved in making and ratifying the termination decision had direct knowledge of Ms. Halalilo's Title IX reports and requests.

90. On these and other bases, Defendants committed discrimination and retaliation under Title IX, 20 U.S.C. § 1681.

91. Under Title IX, 20 U.S.C. § 1681 and *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992), Defendants are liable to Ms. Halalilo:

      a. for general damages including but not limited to an amount equal to—

          i. the amount of any wages, salary, employment benefits, or other compensation denied or lost to Ms. Halalilo by reason of the violation; and

ii.    the interest on the amount described in clause (i) calculated at the prevailing rate.

b.    for such equitable relief as may be appropriate, including employment, reinstatement, promotion, reversing and expunging the unjust termination, and clearing Ms. Halalilo's professional record; and

c.    reasonable attorney fees, and litigation costs including but not limited to expert fees.

<u>COUNT II</u>
<u>TITLE VII DISCRIMINATION</u>

92.    Plaintiff realleges the preceding allegations as though fully herein repeated.

93.    Plaintiff is a "person" and "employee" under Title VII, 42 U.S.C. § 2000e(a) and (f).

94.    Plaintiff is a member of more than one "protected class," including "sex" (female), "race" (Polynesian), and "religion" (non-LDS) under Title VII, 42 U.S.C. § 2000e-2(a)(1).

95.    Having formerly employed Plaintiff as Athletics Director or (AD), Defendants within the meaning of the following statutes are each a "person" and "employer" under Title VII, 42 U.S.C. § 2000e(a) and (b).

96.    Ms. Halalilo suffered tangible, adverse employment actions, including but not limited to that Defendants terminated the employment of Ms. Halalilo on May 4, 2025.

97.    Mr. Halalilo's "sex" (female), "race" (Polynesian), and "religion" (non-LDS) were all motivating factors in NMHU's adverse actions.

98.    This direct causal link is shown by circumstances including but not limited to:

a.    the 2024 admission by then-President Minner that Regent Sanchez was hostile based on sex to the notion of a Female AD;

b.    the close timing between Woolf (White LDS Male) rising to NMHU

18

President and the abrupt halt to what for years had been a steady rise in position and prestige for Ms. Halalilo (Non-White Non-LDS Female);

c. the close timing between Regent Sanchez becoming Chair (March 19, 2025) and Halalilo's termination (May 4, 2025);

d. Woolf reached the termination decision to terminate Ms. Halalilo (a Non-White Non-LDS Female) after conferring with Grindstaff (White LDS Male) and Football Coach Taufa'asau (LDS Male);

e. Woolf first approached two White LDS Males—Grindstaff and Settembre—and a White LDS Female (Evans) to replace Ms. Halalilo; and

f. Woolf then hired Noble (White Male) to fill the AD position.

99. On such bases, Defendants committed discrimination and retaliation under Title VII, 42 U.S.C. § 2000e-2.

100. Under Title VII, Defendants are liable to Ms. Halalilo for:

a. reinstatement with backpay and any other equitable relief as the court deems appropriate, such as promotion, reversing and expunging the unjust termination, and clearing Ms. Halalilo's professional record, 42 U.S.C. § 2000e-5(g)(1);

b. compensatory damages, 42 U.S.C. § 1981a(a)(1), including:

i. the amount of any wages, salary, employment benefits, or other compensation denied or lost to Ms. Halalilo by reason of the violation;

ii. the interest on the amount described in clause (i) calculated at the prevailing rate;

c. punitive damages, 42 U.S.C. § 1981a(a)(1); and

d. reasonable attorney fees pursuant to 42 U.S.C. § 2000e-5(k), and litigation costs including but not limited to expert fees.

## COUNT III
## TITLE VII RETALIATION

101.    Plaintiff realleges the preceding allegations as though fully herein repeated.

102.    As above noted, NMHU terminated Ms. Halalilo soon after she opposed unlawful practices and assisted and participated in an investigation under Title VII, 42 U.S.C. § 2000e-3(a).

103.    NMHU's May 4, 2025 termination of Ms. Halalilo occurred:

a.    less than two months after Ms. Halalilo (in March 2025) denied Coach Fearing a raise for not applying/enforcing a policy against staff having romantic relationships with Student-Athletes they coached;

b.    less than seven weeks after Regent Sanchez—against whom Ms. Halalilo made a December 20, 2024 sexual harassment complaint—rose to the position of Regents Chair on March 19, 2025;

c.    less than seven weeks after Ms. Halalilo rejected unwelcome sexual advances by Grindstaff on March 19, 2025; and

d.    less than four weeks after Ms. Halalilo drew Taufa'Ausa's ire by suspending one of his male Football Student-Athletes (in April 2025) for threatening a Female Assistant.

104.    Each and all of Mr. Halalilo's protected complaints, reports, and efforts to apply non-discrimination standards were a but-for cause of NMHU's adverse actions.

105.    This direct causal link is shown not only by the above-noted close timing, but also by circumstances including but not limited to:

a.    the 2024 admission by then-President Minner that Regent Sanchez was

20

hostile based on sex to the notion of a Female AD;

b.     the December 20, 2024 actions of Woolf, laughing off Ms. Halalilo's report of—and thereby embracing and ratifying—Regent Sanchez's sexual harassment; and

c.     Woolf reached the termination decision to terminate Ms. Halalilo after conferring with Grindstaff and Taufa'asau—both of whom Ms. Halalilo had recently crossed by suspending Taufa'asau's Student-Athlete and by rejecting Grindstaff's sexual advance.

106.    On such bases, Defendants committed retaliation under Title VII, 42 U.S.C. § 2000e-2.

107.    Under Title VII, Defendants are liable to Ms. Halalilo for:

a.     reinstatement with backpay and any other equitable relief as the court deems appropriate, such as promotion, reversing and expunging the unjust termination, and clearing Ms. Halalilo's professional record, 42 U.S.C. § 2000e-5(g)(1);

b.     compensatory damages, 42 U.S.C. § 1981a(a)(1), including:

i.     the amount of any wages, salary, employment benefits, or other compensation denied or lost to Ms. Halalilo by reason of the violation;

ii.     the interest on the amount described in clause (i) calculated at the prevailing rate;

c.     punitive damages, 42 U.S.C. § 1981a(a)(1); and

d.     reasonable attorney fees pursuant to 42 U.S.C. § 2000e-5(k), and litigation costs including but not limited to expert fees.

## COUNT IV
## HRA DISCRIMINATION

108.    Plaintiff realleges the preceding allegations as though fully herein repeated.

109.    Plaintiff is a "person" and "employee" under HRA, NMSA § 28-1-2(a) and (e).

21

110.    Plaintiff is a member of more than one "protected class," including "sex" (female), "race" (Polynesian), and "religion" (non-LDS) under HRA, NMSA § 28-1-7(a).

111.    Having formerly employed Plaintiff as Athletics Director or (AD), Defendants within the meaning of the following statutes are each a a "person" and "employer" under HRA, NMSA § 28-1-2(a) and (b).

112.    Ms. Halalilo suffered tangible, adverse employment actions, including but not limited to that Defendants terminated the employment of Ms. Halalilo on May 4, 2025.

113.    Mr. Halalilo's "sex" (female), "race" (Polynesian), and "religion" (non-LDS) were all motivating factors in NMHU's adverse actions.

114.    This direct causal link is shown by circumstances already noted.

115.    On such bases, Defendants committed discrimination and retaliation under HRA, NMSA § 28-1-7(a).

116.    Under HRA, Defendants are liable to Ms. Halalilo for:

a.    reinstatement with backpay and any other equitable relief as the court deems appropriate, such as promotion, reversing and expunging the unjust termination, and clearing Ms. Halalilo's professional record;

b.    compensatory damages, NMSA § 28-1-13(d), including:

i.    the amount of any wages, salary, employment benefits, or other compensation denied or lost to Ms. Halalilo by reason of the violation;

ii.    emotional distress;

iii.    the interest on the amount described in clause (i) calculated at the prevailing rate; and

c.    reasonable attorney fees pursuant NMSA to § 28-1-13(d), and litigation costs including but not limited to expert fees.

COUNT V
HRA RETALIATION

117.    Plaintiff realleges the preceding allegations as though fully herein repeated.

118.    As above noted, NMHU terminated Ms. Halalilo soon after opposed unlawful practices under HRA, NMSA § 28-1-7(i)(2).

119.    In addition to the above-described manners in which Ms. Halalilo's objections, complaints, and reports were protected under HRA, the issues she raised with respect to Coaches fraternizing/having romantic relationships with Student-Athletes also amounted to protected advocacy to protect students from potential sexual discrimination (including tacit quid pro quo, "sexual favoritism," and harassment) under NMSA § 28-1-7(f) (access to public services, facilities, accommodations, or goods) or NMSA § 28-1-7(m) (participants in governmental services or programs). *See Johnson v. Bd. of Educ. for Albuquerque Pub. Schs.*, 2025-NMSC-014 (holding public schools are "public accommodations under HRA), *aff'g* 2023-NMCA-069, 535 P.3d 687 and *overruling Human Rights Comm'n of New Mexico v. Bd. of Regents of Univ. of N.M. College of Nursing*, 1981-NMSC-026, 95 N.M. 576, 624 P.2d 518.

120.    In turn, on all these grounds, Ms. Halalilo engaged in opposition/participation activity broadly protected by NMSA § 28-1-7.

121.    As above noted, a clear motivating and but-for cause of NMHU's May 4, 2025 termination of Ms. Halalilo was her recent HRA-protected complaints and HRA-related actions, which included but were not limited to crossing/angering Taufa'asau by suspending his Student-Athlete and recently rejecting an unwanted sexual advance by Grindstaff—both of whom were in final discussions with Woolf just before and leading to the termination.

122.    On such bases, Defendants committed retaliation including "aiding," "abetting,"

23

"inciting," "compelling," "threats," "reprisal," and "discrimination" under HRA, NMSA § 28-1-7(i)(1), (2), and (3).

123.    Under HRA, Defendants are liable to Ms. Halalilo for:

a.    reinstatement with backpay and any other equitable relief as the court deems appropriate, such as promotion, reversing and expunging the unjust termination, and clearing Ms. Halalilo's professional record;

b.    compensatory damages, NMSA § 28-1-13(d), including:

i.    the amount of any wages, salary, employment benefits, or other compensation denied or lost to Ms. Halalilo by reason of the violation;

ii.    emotional distress;

iii.    the interest on the amount described in clause (i) calculated at the prevailing rate; and

c.    reasonable attorney fees pursuant NMSA to § 28-1-13(d), and litigation costs including but not limited to expert fees.

COUNT VI<br>FPWA DISCRIMINATION AND RETALIATION

124.    Plaintiff realleges the preceding allegations as though fully herein repeated.

125.    Plaintiff is an "employee" under FPWA, NMSA § 28-23-2(d).

126.    Defendants are an "employer" under FPWA, NMSA § 28-23-2(e).

127.    Plaintiff by the above and following acts engaged in "asserting a claim or right pursuant to [FPWA] or assisting another person to do so, or for informing another person about employment rights or other rights provided by law" under FPWA, NMSA § 28-23-2(d).

128.    Through March 2023, the NMHU AD had been Andrew Ehling (at a salary of $105,000).

129.    In March 2023, Ehling left, and NMHU promoted/hired Ms. Halalilo and Jim Deisler (White Male) to be Co-AD's.

24

130. When doing so, NMHU proposed a pay arrangement that violated the FPWA:  to pay the Male Co-AD (Deisler) a salary of $105,000 and Ms. Halalilo a salary of $85,000.

131. Each of the Co-AD positions was to have the same job description and involved performance requiring equal skill, effort, responsibility, and similar working conditions under FPWA, NMSA § 28-23-3(a).

132. NMHU's proposal of and effort to have Ms. Halalilo agree to such unequal pay between the two Co-AD positions was, itself, an act of "discrimination" and a violation under FPWA, NMSA § 28-23-3(a).

133. Ms. Halalilo has timely brought her FPWA with respect to that proposal by filing this FPWA claim within "two years from the last date of the employee's employment," *see* FPWA, NMSA § 28-23-4(d), and within "six years" of "the date of the last violation of the [FPWA]." *See* FPWA, NMSA § 28-23-6(d)

134. In addition, Ms. Halalilo resisted this proposal, and after this pushback, NMHU conceded it must pay both Deisler and Ms. Halalilo the same rate for the same job description.

135. As a result, in March 2023, NMHU required and employed two full-time Co-AD's to fulfill the job duties of the AD role, and paid each of them approximately $105,000, for a combined AD-role pay of $210,000.

136. Thereafter, and continuing through 2024, the Regents continually protested the pay going to the Co-AD's—with seemingly more discontent over the equal pay to Ms. Halalilo.

137. In January 2025, when NMHU dissolved the Co-AD strategy and consolidated the AD role back into one position, held by Ms. Halalilo, NMHU did not compensate Ms. Halalilo for anything close to the combined salaries of the two prior Co-AD's.

138. Instead, NMHU again attempted to make Ms. Halalilo do the work of two people

for little more than she had paid for working as but one of two Co-AD's.

139.    Ms. Halalilo again stood up for herself, advocated for fair pay, and sought a higher rate of pay to assume both Co-AD's duties, if not also commensurate with the rates of pay NMHU had previously seen fit to award each of the positions previously, when one of those positions had been held by a Male (Deisler).

140.    By all the above discussions and requests for fair pay, Ms. Halalilo engaged in "asserting a claim or right pursuant to [FPWA] or assisting another person to do so, or for informing another person about employment rights or other rights provided by law" under FPWA, NMSA § 28-23-2(d).

141.    Within months of these discussions, and within just weeks after the most sexist member of the Regents, Sanchez, rose to the position of Regents Chair on March 19, 2025, NMHU terminated Ms. Halalilo. *See* NMSA § 28-3-5.

142.    As above noted, NMHU terminated Ms. Halalilo soon after she opposed unlawful practices under FPWA, NMSA § 28-3-3(a).

143.    As above noted, a clear motivating and but-for cause of NMHU's May 4, 2025 termination of Ms. Halalilo was her recent FPWA-protected complaints, requests, and actions.

144.    On such bases, Defendants committed retaliation including discharging, demoting, denying promotion to or in other ways discriminating Ms. Halalilo in the terms or conditions of her employment under FPWA, NMSA § 28-23-5.

145.    Under FPWA, Defendants are liable to Ms. Halalilo for:

   a.    reinstatement with backpay and any other equitable relief as the court deems appropriate, such as promotion, reversing and expunging the unjust termination, and clearing Ms. Halalilo's professional record;

   b.    compensatory damages, including:

26

    i.  the amount of any wages, salary, employment benefits, or other compensation denied or lost to Ms. Halalilo by reason of the violation, *see* FPWA, NMSA § 28-23-6(a)(1);

    ii.  emotional distress, *see* FPWA, NMSA § 28-23-6(a)(2);

    iii.  the interest on the amount described in clause (i) calculated at the prevailing rate;

    c.  treble damages, *see* FPWA, NMSA § 28-23-6(a)(3);

    d.  punitive damages, *see* FPWA, NMSA § 28-23-6(a)(C); and

    e.  reasonable attorney fees and litigation costs including but not limited to expert fees pursuant NMSA to § 28-23-4(b).

COUNT VII<br>WPA RETALIATION

146. Plaintiff realleges the preceding allegations as though fully herein repeated.

147. Plaintiff was a "public employee" under WPA, NMSA § 10-16C-2(b).

148. Defendants are a "public employer" under WPA, NMSA § 10-16C-2(c).

149. Plaintiff by the above complaints and opposition to Defendants' Title IX, Title VII, HRA, and FPWA violations:

    A.  communicate[d] to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act;

    B.  provide[d] information to, or testifie[d] before, a public body as part of an investigation, hearing or inquiry into an unlawful or improper act; **and**

    C.  object[ed] to or refuse[d] to participate in an activity, policy or practice that constitutes an unlawful or improper act.

*See* §10-16C-2 (C)(3) NMSA 1978.

150. The conduct of Defendants upon which Plaintiff advocated, reported, and complained constituted reasonably-perceived "unlawful or improper acts" within the meaning of WPA, because they each involved "a practice, procedure, action or failure to act on the part of a

27

public employer" that:

>    (1)    violates a federal law, a federal regulation, a state law, a state administrative rule or a law of any political subdivision of the state;
>    (2)    constitutes malfeasance in public office; or
>
>    (3)    constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public.

*See* §10-16C-2 (E) NMSA 1978.

151.    Plaintiff spoke out on these issues not only in her personal and private interest in maintaining her employment and asserting and protecting her own legal and employment rights under Title IX, Title VII, HRA, and FPWA, but also for a public purpose, public good, and in the public interest to secure NMHU's compliance with these laws for the protections of all Employees, Students, and Student-Athletes.

152.    Defendants—by and through highest-ranking employees such as Woolf, Mariampolski, and Lovato—who were aware of Plaintiff's prior, protected WPA reports, complaints, and actions, took retaliatory actions against Plaintiff for these reports in the form of a hostile work environment and termination of Plaintiffs' employment. *Lerma v. N.M. Dep't of Corrections*, 2024-NMCA-011, *cert. granted* ("Our Legislature has defined 'retaliatory action' broadly as 'any discriminatory or adverse employment action against a public employee in the terms and conditions of public employment'") (citing § 10-16C-2(D) NMSA); *Dart v. Westall*, 2018-NMCA-061, ¶ 23, 428 P.3d 292 (concluding the evidence sufficed to support a jury finding of "retaliatory action" under the NMWPA where the defendant reassigned the plaintiff to a new division, "created a hostile work environment, made humiliating comments about him to his colleagues, issued him a substandard work vehicle, and required him to surrender his key to the forensic lab and cease investigating his caseload of crimes against children").

153.    For the above reasons, and based on the circumstances noted above, Plaintiff's WPA-protected reports, complaints, and actions were a motivating and but-for cause of Defendants' adverse actions and eventual termination against Ms. Halalilo.

154.    On such bases, Defendants committed whistleblower retaliation in violation of NMSA § 10-16C-3.

155.    Under NMSA § 10-16C-4, Defendants are liable to Plaintiff for actual damages, including but not limited to back pay, front pay, lost employee benefits including but not limited to retirement benefits under the Public Employees Retirement Association, and emotional distress, reinstatement to the position and seniority status Plaintiff would have had but for the violation, two times the amount of back pay with interest on the back pay, compensation for special damages including emotional distress sustained as a result of the violation, and litigation costs and reasonable attorney fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court order as to her claims for violations of Title IX, Title VII, HRA, FPWA, and WPA, that Plaintiff be awarded damages, including but not limited to unpaid or underpaid wages; back and front pay and benefits; pre- and post-judgment interest as permitted by law; emotional distress; additional liquidated damages in the amount of the same foregoing; treble damages; punitive damages; costs and reasonable attorneys' fees; actual damages including back pay, reinstatement, two times the amount of back pay, interest on the back pay, special damages including emotional distress and associated medical bills; and the same and further common-law damages; costs and attorney fees; prejudgment interest; post-judgment interests; and any such other and further relief as the Courts deems just and proper.

JURY DEMAND

Plaintiff hereby demands trial by jury on all issues so triable.

Filed this 21st day of May, 2026.

Respectfully Submitted,

*-/s/ - Trent A. Howell –*
*Electronically filed & signed-*
Attorney Trent A. Howell
P.O. Box 2304
Santa Fe, New Mexico  87504
trent@trentahowell.com
(505) 919-9158
*Counsel for Plaintiff Shanna Halalilo*

30